Filed 6/25/24  Stoffel v. The Regents of the Univ. of Cal. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SEAN STOFFEL et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>Defendant and Respondent. | B320813<br><br>(Los Angeles County Super. Ct. No. JCCP5112) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Yvette M. Palazuelos, Judge.  Affirmed in part and reversed in part.

Bursor & Fisher, Joel D. Smith; Pearson Warshaw, Daniel L. Warshaw, and Neil Swartzberg for Plaintiffs and Appellants.

Reed Smith, Raymond A. Cardozo, and Brian A. Sutherland for Defendant and Respondent.

Plaintiffs and appellants Andrew Pham, Ashley Chen, and Maribelle Assaad Boutros (plaintiffs) were students at various University of California campuses in March 2020 when the campuses transitioned to providing solely remote instruction as a result of the COVID-19 pandemic. Plaintiffs sued defendant and respondent The Regents of the University of California (the Regents) alleging they were entitled to a refund of a portion of the tuition and fees they paid for the academic sessions that were conducted remotely because the Regents breached an implied contract to provide an in-person, on-campus education. We consider whether the trial court correctly sustained the Regents' demurrer without leave to amend, and this task principally requires an assessment of whether plaintiffs adequately allege the Regents' actions and statements amount to a "specific promise" (*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 826) of an in-person, on-campus education.

## I.  BACKGROUND

A.  *The University of California, Plaintiffs, and the COVID-19 Pandemic*[1]

1.  *The University of California and its marketing*

The University of California is a public university system with ten university campuses: UC Berkeley, UC Davis, UC Irvine, UCLA, UC Merced, UC Riverside, UC San Diego (UCSD), UC San Francisco, UC Santa Barbara (UCSB), and UC Santa

---

[1]  We summarize the facts as alleged in the complaint and as judicially noticed by the trial court. (*Larson v. UHS of Rancho Springs, Inc.* (2014) 230 Cal.App.4th 336, 340, fn. 2.)

2

Cruz (collectively, the UC System). The UC System has consistently educated its students on campus since its founding in 1868.

The campuses that make up the UC System are, in the aggregate, spread across approximately 66,000 acres of land that house numerous buildings including lecture halls, science labs, and other classrooms. The UC System also provides on-campus services to students: campus libraries, student centers, gyms, counseling centers, health clinics, and sports complexes.

Prior to the COVID-19 pandemic, the UC System marketed and admitted students to its in-person, on-campus education program separately from online education programs it also offered. The UC System makes available to students 840 undergraduate majors and 600 graduate degree programs that were taught in-person and on-campus. The UC System's online courses do not include any online degree programs.

The UC System's marketing materials are a primary means through which it targets prospective students. In the years preceding the onset of the COVID-19 pandemic, the marketing materials for various UC System campuses touted the benefits of attending school on campus. For example, marketing materials for UCLA stated, "Learning occurs not only in the classroom, but also through engagement in campus life and in communities and organizations beyond the university. [¶] Living here is part of the experience. All of the residence halls are within a couple minutes . . . walk of each other—with classes not much farther than that." UCSD's materials promoted its "academic programs . . . focused on linking classroom instruction with relevant, real-world experiences . . ."; touted the benefits of "get[ting] connected to a life beyond the classroom" and "getting

3

engaged on campus"; and proclaimed it "offer[ed] unique campus-wide events . . . ." UCSB's materials asserted, "[c]lassroom learning is only part of a great education! The other half is undergraduate research in labs, libraries, studios, and in the field—hands-on experiences that will give you an extra edge when you apply for graduate school or a great job after graduation." UC Merced's materials similarly asserted, "UC Merced undergraduates experience education inside and outside the classroom." UC Irvine's materials stated "[i]ndependent research in laboratories, field study, participation in writing workshops, and in arts production are normal elements of the UCI experience." Many of the materials also touted the benefits of joining campus student organizations.

Students enrolling in UC System schools viewed course catalogs to make course selections and register for classes. The course catalogs provided students with information regarding the courses offered, including the building and room number in which the courses were to be taught. For most, if not all, of the campuses, the course catalogs available electronically allowed students to filter their search so the results reflected either online courses or in-person courses. After students registered for classes, they received a schedule reflecting course details—again including the building and room number in which the course was to be taught.

### 2. *Plaintiffs enroll at UC System campuses*

Maribelle Assaad Boutros (Boutros) enrolled in a Bachelor of Arts degree program at UCSB in the Fall of 2016. During her academic sessions at UCSB prior to the onset of the pandemic, Boutros paid tuition and fees and received in-person instruction

4

and access to on-campus services.  She registered for the Spring 2020 session on February 18, 2020, and received a schedule that identified room locations for each of her courses.  The course catalog she received for registration also identified room locations for classes.  Boutros was billed for the Spring 2020 session on February 14, 2020, and paid for the session on February 27, 2020.

Ashley Chen (Chen) enrolled in a Master of Science degree program in Business at UCLA in the Fall of 2019.  During his academic sessions at UCLA prior to the onset of the pandemic, Chen paid tuition and fees and received in-person instruction and access to on-campus services.  Chen registered for Spring 2020 session classes at UCLA.  The course catalog provided to Chen during registration identified the physical locations where the courses would be held.  The schedule Chen received after registration stated, "all MSBA [Master's of Science in Business Administration] classes are held on campus at UCLA."  On February 21, 2020, UCLA billed Chen for the Spring 2020 session.  Chen paid the Spring 2020 bill prior to attending classes.

Andrew Pham (Pham) enrolled in a Bachelor of Science degree program at UCSD in the Fall of 2017, after the school promoted itself as providing an in-person and on-campus experience.  During his academic sessions at UCSD prior to the onset of the pandemic, Pham paid tuition and fees and received in-person instruction and access to on-campus services.  Pham registered for courses before the start of the session, and Pham's course registration for Spring 2020 identified the physical locations where the courses would be held.  Pham was charged for the Spring 2020 session and paid the charges prior to attending classes.

Plaintiffs were charged, and paid, tuition plus a variety of associated fees, which varied to some degree at the individual campuses.[2] The fees at UCSD, for example, included a student services fee for "services that benefit the student and are complementary to . . . the instructional program," a campus activity fee to support "student activities on campus," a University Center fee to "[c]over[] construction and operation of the Student Centers," a student transportation fee to support "mass-transit services to students," a recreation fee to support "student recreation on campus," and an ICA student activity fee to support "UCSD intercollegiate athletic teams." Other UC schools similarly made representations about the nature of the services that students would receive in exchange for the fees.

### 3. The COVID-19 pandemic and the change to remote learning

In early March 2020, Governor Gavin Newsom issued an executive order declaring a state of emergency in California related to the COVID-19 pandemic. Later that month, Governor Newsom issued an executive order requiring all individuals living in California to stay at home or in their place of residence with limited "essential services" exceptions.

Shortly thereafter, the UC System began issuing directives to its students: requiring them to take classes online, strongly encouraging them to move off campus, asking them not to come

---

[2] The student services fee is a UC System-wide fee paid by all students, and the remaining fees are campus-based fees that are unique to each respective UC campus.

6

to campus, and closing most campus facilities. The UC System's directives were not clear about the scope of the campus closures or how long the closures and transition to remote learning would last. On March 19, 2020, the UC System's President confirmed all schools had moved solely to remote instruction. Individual UC System schools also announced the Spring 2020 session would be remote by March 19, 2020.[3]

Classes for all three plaintiffs were to start on March 30, 2020. March 30, 2020, was also the deadline for students to withdraw from the academic session and receive a full refund. After the change to remote learning, plaintiffs were involuntarily transitioned to online classes, were barred from going to campus, and were no longer able to avail themselves of other on-campus activities.

The UC System initially asserted it would continue charging tuition and mandatory system and campus-based fees for all enrolled students for the Spring 2020 session. On June 29, 2020, the UC System President sent a letter to the schools asking each to analyze their Spring 2020 campus-based fees and, where appropriate and feasible, to issue refunds or their equivalents. The letter provided the individual schools with a set of guiding principles they were to use in conducting their analyses of the campus-based fees and stated that after an analysis, "you may move forward with enacting a policy . . ." regarding the refunds.

---

[3]     The academic calendars for all ten UC campuses, which were judicially noticed by the trial court, state UC Berkeley and UC Merced operated on a semester basis during the relevant time period and all other campuses were on a quarter system.

Plaintiffs allege they did not receive any pro-rated payment from the Regents for the fees and tuition they paid for the Spring 2020 and later remotely-conducted sessions.

### B.     *This Litigation*

In April 2020, Sean Stoffel and Luis Peña filed a class action complaint against the Regents alleging breach of contract based on the UC System's change to remote learning and closure of campus facilities while continuing to charge students full tuition and fees at the start of the COVID-19 pandemic.  Other students filed similar suits, all the cases were coordinated, and plaintiffs filed a consolidated class action complaint in March 2021.  As we proceed to detail, the consolidated class action complaint alleges causes of action for breach of contract, unjust enrichment, and conversion; the Regents demurred to the complaint; and the trial court sustained the demurrer to the complaint and dismissed the action.

### 1.     *The operative complaint*

Plaintiffs filed a first amended consolidated class action complaint (the operative complaint) in September 2021 that alleges a breach of express contract claim, a breach of implied-in-fact contract for tuition claim, a breach of implied-in-fact contract for fees claim, and a quasi-contract claim.

As pertinent to the only causes of action that are at issue on appeal—the causes of action for breach of an implied contract for tuition and for fees—the operative complaint alleges plaintiffs entered into implied-in-fact contracts with the Regents.  Those contracts provided plaintiffs would pay tuition and fees and the Regents would provide an in-person, on-campus education

8

(including services like access to on-campus facilities). The contracts were created when plaintiffs accepted their offers of enrollment and were further affirmed each academic session through course registration and payment of bills, among other things. The terms of the contracts were evidenced by the UC System's academic catalogs, student handbooks, marketing materials and other publications, and the UC System's course of dealing. Plaintiffs performed their obligation under the contract by paying their fees and tuition, but the Regents did not provide the in-person and on-campus services for which plaintiffs paid—thereby breaching the contracts.

Plaintiffs allege they were damaged financially by the Regents' breach because the Regents did not deliver the educational services, facilities, access, or opportunities for which plaintiffs and the class members contracted and paid. The Regents instead provided an alternative, materially different product, which deprived plaintiffs and class members of access to materials, faculty, library facilities, laboratory facilities, activity facilities, and the opportunity for collaborative learning and in-person dialogue, feedback, and critique.

### 2. *The Regents' demurrer and the trial court's ruling*

The Regents demurred to the operative complaint. As pertinent for our purposes, the Regents argued plaintiffs had not identified any specific promise for on-campus instruction and accepted the Spring 2020 quarter would be remote prior to the deadline to withdraw. The Regents also asserted that claims regarding the campus-based fees could not be brought through a breach of contract action because of the ongoing administrative

review process occasioned by the UC System President's letter to the schools directing an analysis of the feasibility of fee refunds. The Regents further contended a policy it previously adopted, Regents Policy 3101, barred plaintiffs' contract claims because the policy gives the Regents discretion to set fees and tuition at any level they deem appropriate based on a full consideration of the circumstances.[4]

The trial court sustained the demurrer without leave to amend. The court found plaintiffs had not sufficiently alleged a specific promise of in-person, on-campus education, which was required to state a valid cause of action for an implied contract between a student and university. The trial court specifically found none of the UC System marketing materials and publications included a specific promise for an on-campus instruction or experience or a specific promise to keep students on campus during a pandemic despite government orders prohibiting physical gathering.

Regarding catalogs and course schedules, the trial court found plaintiffs had not pointed to any statement that on-campus instruction in the locations identified was guaranteed. Instead, the court found, general disclaimers included in the course catalogs stated all courses and related details were subject to change without notice. The court also found the plaintiffs' billing

---

[4] The Regents also filed a motion to strike the operative complaint and sought judicial notice of a variety of documents reflecting UC System announcements and policies, among other things. The trial court granted the request for judicial notice in its entirety and denied the motion to strike as moot.

statements did not contain any explanations or promises that plaintiffs would receive in-person instruction.

As to fees, the trial court found most of the fees identified were campus-based fees, the Regents had instituted an administrative review process to determine whether the fees warranted refunds, and plaintiffs had not pled exhaustion of the procedure. The court thus concluded claims for refunds of those fees could not be brought through a breach of contract action. As to the student services fee in particular, the trial court found it came with no associated specific promise of any particular on-campus service.

The trial court also rejected as insufficient plaintiffs' allegation that defendant had a usual and customary practice of providing in-person classes and on-campus services and had previously provided those services to plaintiffs. The court believed that allegation merely described what defendant had done in the past, not what it promised to do in the future.

In addition, the trial court concluded all plaintiffs had agreed to enroll and paid tuition knowing they would not receive on-campus instruction. The court contended the operative complaint's allegation that the UC System was not clear about the scope or duration of campus closures by mid-March 2020 was contradicted by the Regents' judicially noticeable evidence that all students were notified the entire spring term would be remote before the March 30, 2020 withdrawal deadline. In so finding, the trial court rejected plaintiffs' contention that they initiated a multi-year contract for in-person classes when they were first admitted because plaintiffs had not alleged the Regents specifically promised it would never change to exclusively online instruction in any future term. Rather, the UC System charged

11

fees separately prior to each academic term and each student had a choice before each term whether or not to pay.

## II.  DISCUSSION

This case comes to us only at the initial demurrer stage of litigation and we hold plaintiffs adequately allege claims for breach of implied contract sufficient to survive demurrer.  The only element of an implied contract claim that is in question here, i.e., whether the provision of an in-person, on-campus education was a term of the contract, is satisfied by plaintiffs' allegations regarding the UC System's statements in marketing materials, course catalogs, and class schedules.  The Regents will of course be free to assert substantive defenses as the litigation progresses, but their arguments for dismissal of the case at this stage are unpersuasive.  Reversal is accordingly required.

### A.     *Standard of Review*

"'Because the function of a demurrer is to test the sufficiency of a pleading as a matter of law, we apply the de novo standard of review in an appeal following the sustaining of a demurrer without leave to amend.  [Citation.]  We assume the truth of the allegations in the complaint, but do not assume the truth of contentions, deductions, or conclusions of law.'" (*United Talent Agency v. Vigilant Ins. Co.* (2022) 77 Cal.App.5th 821, 829.)  "[T]he allegations of the complaint must be read in the light most favorable to the plaintiff and liberally construed with a view to attaining substantial justice among the parties." (*Venice Town Council v. City of L.A.* (1996) 47 Cal.App.4th 1547, 1557.)  ""We also consider matters which may be judicially noticed." [Citation.]  Further, we give the complaint a reasonable

12

interpretation, reading it as a whole and its parts in their context.  [Citation.]  When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action.  [Citation.]'  [Citation.]"  (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.)

> ### B.  *Plaintiffs Sufficiently Allege a Breach of Implied Contract for Tuition*
> #### 1.  *The relationship between a university and its students*

"'[B]y the act of matriculation, together with payment of required fees, a contract between the student and the institution is created . . . .'  [Citation.]"[5]  (*Andersen v. Regents of Univ. of Cal.*

---

[5]  There are circumstances in which courts apply contract law flexibly to contracts between universities and their students in recognition of the fact that "[u]niversities are entitled to some leeway in modifying their programs . . . to exercise their educational responsibility properly."  (*Kashmiri, supra,* 156 Cal.App.4th at 824-825.)  Those are not the circumstances presented by this appeal, however, where the question "does not involve what is essentially an educational malpractice claim or a decision that involves disciplinary discretion."  (*Id.* at 826.)

We note that the Regents' briefs in this court could be generously read to hint that the law should not be so.  But the Regents never actually argue they cannot be liable on a contract theory or that *Kashmiri, supra,* 156 Cal.App.4th 809, was wrongly decided.  Instead, they present only a vague, undeveloped assertion that *Kashmiri*'s "specific promise" requirement should be "rigorous[ly] appl[ied]."  Precisely what that means is left unclear, but what is clear is that any claim that *Kashmiri* does not state the controlling principles for proper

13

(1972) 22 Cal.App.3d 763, 769.)  Where, as here, there is no express contract between the Regents and the student, "an implied contract was created by the students' conduct when they accepted the [Regents'] offer of enrollment." (*Kashmiri*, *supra*, 156 Cal.App.4th at 829; see also Civ. Code § 1621 ["[a]n implied contract is one, the existence and terms of which are manifested by conduct"].)

"The essential elements of a claim of breach of contract, whether express or implied, are the contract, the plaintiff's performance or excuse for nonperformance, the defendant's breach, and the resulting damages to the plaintiff." (*Green Valley Landowners Assn. v. City of Vallejo* (2015) 241 Cal.App.4th 425, 433.)  "As to the basic elements [of mutual assent and consideration], there is no difference between an express and implied contract." (*Division of Labor Law Enforcement v. Transpacific Transportation Co.* (1977) 69 Cal.App.3d 268, 275.)

> 2.  *Plaintiffs sufficiently allege an implied contract to provide an in-person and on-campus educational experience*

A university can be liable for breach of a contract with its students if it "ma[de] a specific promise to provide an educational service," but did not provide it. (*Kashmiri*, *supra*, 156 Cal.App.4th at 826.)  Statements in the catalogs and website of a university may be binding on the university if the university expressly states it intends to be bound by them, or if the statements are implied-in-fact contract provisions. (*Kashmiri*,

resolution of this appeal or that the case is somehow analytically incomplete is forfeited for failure to adequately present the issue.

*supra*, at 826; see also *Zumbrun v. University of Southern California* (1972) 25 Cal.App.3d 1, 10.) "[L]ike all obligations imposed pursuant to implied contractual terms, the contractual obligations imposed by the language in catalogues '"center around what is reasonable.' [Citations.]" (*Kashmiri*, *supra*, at 829.) "To determine the reasonable expectation of the parties we examine 'the totality of the circumstances . . . . Agreement may be '"shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances."'" [Citation.]" (*Id.* at 832.) "The reasonableness of the student's expectation is measured by the definiteness, specificity, or explicit nature of the representation at issue." (*Ibid.*)

Here, plaintiffs alleged the UC System promoted its in-person, on-campus educational experience in its marketing materials. Those materials include UCLA's statement that "[l]earning occurs not only in the classroom, but also through engagement in campus life" and its assertion that residence halls are not far from "classes"; UCSB's touting of both "[c]lassroom learning" and "undergraduate research in labs, libraries, studios, and in the field"; UC Irvine's declaration that "[i]ndependent research in laboratories, field study, participation in writing workshops, and in arts production are normal elements of the UCI experience"; and UCSD's statement that its "academic programs . . . are focused on linking classroom instruction with relevant, real-world experiences . . . ." Plaintiffs also allege that when they registered for classes, they viewed course catalogs that identified specific buildings and room numbers in which the classes would be taught. The registration process allowed students to differentiate between classes taught online and those

15

taught in person. And after registration, students received schedules reflecting the building and room number assigned to the course. Chen's UCLA schedule for the Spring 2020 session, in particular, expressly stated that all classes would be taught on campus.

Reading the operative complaint's allegations in the light most favorable to plaintiffs, we conclude they have sufficiently alleged the Regents made a specific promise to provide an in-person, on-campus education. The UC System's emphasis on the value of its in-person and on-campus offerings is threaded throughout portions of its marketing materials, and that, combined with the course catalogs and other writings mentioned in the operative complaint, amount to definite statements regarding the nature of the education it agreed to provide: an in-person, on-campus education. As a result, the reasonable expectations of the parties would be that once a student accepted the Regents' offer to enroll and paid tuition, the Regents would provide an in-person, on-campus education.

We are, in other words, unpersuaded by the Regents' contention that, after making the representations in its marketing materials and other publications, they had (and presumably continue to have) discretion to switch—without consequence or means of redress—from an in-person, on-campus educational program to an online-only experience at any time. Admitted students choose to enroll at, for example, UCLA for the entirety of the educational experience they had been offered, including learning "not only in the classroom, but also through engagement in campus life." Under the Regents' reasoning, a student who enrolled at and paid for UCLA would have no claim for breach of contract if the Regents decided, without notice, to

16

offer them only the online experience they would receive from the University of Phoenix.  That cannot be.  The Regents may have valid affirmative defenses to the breach of contract claims (an issue on which we express no view), but those defenses are not at issue at this stage of the litigation.  The only question before us is whether operative complaint sufficiently alleged the provision of in-person, on-campus education was a term of their implied contract with the Regents.  As we have explained, it does.[6]

The Regents offer several counterarguments, but none is persuasive.

The Regents argue plaintiffs forfeited their ability to rely on UC System marketing materials and publications because

_____

[6]    Because we determine plaintiffs sufficiently allege the Regents made a specific promise to provide an in-person, on-campus education through its marketing and other written materials, we do not rely on plaintiffs' allegations that the UC System had a 100-year custom and practice—of which plaintiffs were well aware—of providing an on-campus education in exchange for payment of tuition and fees.  Obviously, however, that history if combined with the allegations on which we do rely could only bolster the conclusion that a breach of an implied contract has been adequately alleged.  Neither the operative complaint nor the judicially noticed materials disclose any terms contrary to plaintiffs' cited custom.  (*Varni Bros. Corp. v. Wine World, Inc.* (1995) 35 Cal.App.4th 880, 889 [custom and usage may imply terms when no contrary intent appears from the terms of the contract]; see also *Kashmiri, supra,* 156 Cal.App.4th at 828 [noting that courts in other states had found custom and usage could become specific terms by implication, but not expressing a view on the appropriateness of such findings one way or the other].)

17

they did not specifically quote language from those statements in their opening brief. That misunderstands forfeiture doctrine,[7] and forfeiture is in any event a discretionary concept. We have cited examples, found in the appellate record, of UC System statements amounting to specific promises to explain our holding, but the sufficiency of plaintiffs' pleading itself is what is at issue and we hold its implied contract causes of action are sufficiently stated.

The Regents also argue the locations identified in UC System course catalogs and course registration process were merely indicative of its general plan, not a specific promise to provide in-person instruction. Taken alone, the identification of a classroom location may well be insufficient to constitute a specific promise for in-person education. But the complaint here alleges the course catalogs ubiquitously identified physical locations at which classes were to be held, which, in the context of the UC System's other statements promoting in-person education, supports the allegation that the Regents specifically promised in-

---

[7] The Regents conflate authority regarding a failure to discuss an *issue* in an opening brief (which plaintiffs did not do) with authority regarding a failure to identify specific terms in a *complaint* alleging the breach of an express contract (which says nothing about the requirements for an appellate brief). Plaintiffs' opening brief cites to the pages in the appellate record and the specific paragraphs in their operative complaint on which they relied. The Regents cite no authority (nor are we aware of any) holding an appellant is required to quote *all* pertinent language from their underlying complaint in their appellate briefs. Good thing too—that would just result in submission of briefs even longer than they already are.

18

person instruction. (See, e.g., *Saroya v. Univ. of the Pacific* (N.D.Cal. 2020) 503 F.Supp.3d 986, 997; *In re Univ. of San Diego Tuition & Fees Covid-19 Refund Litig.* (S.D.Cal. Mar. 30, 2022, No. 20cv1946-LAB-WVG) 2022 U.S.Dist. LEXIS 59220, *11-15; *Arredondo v. Univ. of La Verne* (C.D.Cal. Apr. 21, 2021, No. 2:20-cv-07665-MCS-RAOx) 2021 U.S.Dist. LEXIS 78314, *5.)

After the close of briefing, the Regents additionally filed a supplemental authority notice calling to our attention a recent opinion from the First District Court of Appeal, *Berlanga v. University of San Francisco* (2024) 100 Cal.App.5th 75, that affirms a summary adjudication order in the defendant university's favor. (*Id.* at 90.) Although *Berlanga* involves a facially similar claim that a university breached a contract to provide students with in-person instruction during the COVID-19 pandemic, the *Berlanga* opinion differs from the present appeal in two important ways.

First, *Berlanga* addressed the viability of the plaintiffs' case for purposes of the university's motion for summary adjudication, not, as here, the sufficiency of a plaintiff's allegations to survive a demurrer (which must be taken as true). (*Berlanga, supra,* 100 Cal.App.5th at 80-82.) Second, and more fundamentally, the university statements upon which the student-plaintiffs in *Berlanga* based their claims were exceedingly general and quite unlike the university statements plaintiffs rely on in their operative complaint here. The *Berlanga* plaintiffs, for instance, alleged their university somehow made actionable promises of in-person instruction through statements in their admissions letters that the students would "'join a dynamic student body,'" "'develop amazing friendships,'" and "'be surrounded by the best city ever'"; by inviting the students to

19

"'admitted student visit days . . . to . . . experience the richness of our university'"; by stating the university's president "'look[ed] forward to greeting [them] on campus'"; and by identifying the physical location of in-person classes in various documents. (*Id.* at 80, 84.) Such statements are obviously insufficient to establish a specific promise of in-person or on-campus instruction.

By contrast, plaintiffs here combine their reliance on statements identifying the physical location at which courses would be held with allegations in the operative complaint concerning the universities' marketing statements that are markedly more specific than those in *Berlanga.* The statements cited by plaintiffs here, unlike those in *Berlanga,* emphasize the import of classroom learning and on-campus experiences as part of the educational process, e.g., as in the case of the UCSB marketing statements, "undergraduate research in labs, libraries, studios, and in the field." The basis for an implied-in-fact contract here is therefore quite different—and remains viable at this early stage of the proceedings—than the vague promises of potential interpersonal relationships and generic statements about the University of San Francisco's physical campus that the *Berlanga* court found wanting.

> 3. *The promise to provide an in-person, on-campus education extended for the duration of an academic session*

Having concluded plaintiffs sufficiently alleged the Regents promised them an in-person, on-campus education, we must also determine the duration of the promise. Plaintiffs primarily contend the Regents' offer of an in-person education was one that extended for the entirety of a student's enrollment. The

20

operative complaint, however, identifies no language promising to provide an in-person education for that entire period. The duration of the promise is thus uncertain.

"'If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it. [Citation.] [¶] Thus, we look to the reasonable expectation of the parties at the time of contract. To determine the reasonable expectation of the parties, we examine 'the totality of the circumstances . . . .' [Citation.]" (*Kashmiri*, *supra*, 156 Cal.App.4th at 831-832; see also Civ. Code §§ 1636, 1649.)

Here, while a student who is offered admission to a university is granted the opportunity to earn a degree over a course of years (assuming the student complies with and satisfies university requirements), students do not pay for an entire program's worth of tuition upon matriculation. Rather, as alleged in the operative complaint, their contract with the university is "affirmed . . . each academic session" through the process of course registration, billing, and payment.

Prior to the commencement of each academic session, the Regents extended plaintiffs an offer to continue their education on the terms the Regents offered—by billing plaintiffs and allowing them to register for courses—and plaintiffs accepted the offer by their conduct—by paying their fees and tuition. Thus, plaintiffs do adequately allege provision of an in-person, on-campus education was a term of their implied contract for the Spring 2020 session. The natural consequence of this conclusion, however, is that plaintiffs have only stated their claim as to the Spring 2020 session. At the time they paid tuition for any subsequent sessions, they were aware the UC System had

21

changed to remote learning in March 2020 and thereby accepted they would not receive an in-person, on-campus experience. Accordingly, the trial court was correct insofar as it concluded plaintiffs have not stated a valid claim for breach of contract for any sessions after Spring 2020.  (See, e.g., *Berlanga*, *supra*, 100 Cal.App.5th at 87-88 [students could not have reasonably believed university promised to provide in-person instruction for Fall 2020 and Spring 2021 semesters, and had not identified contract for in-person instruction for those semesters, where students were notified the semesters would be remote before tuition was due].)

Plaintiffs' contrary contention, that the Regents' promise for in-person, on-campus learning extended throughout the duration of each plaintiff's enrollment, is unavailing.  In support of this argument, they rely on *Kashmiri* for the proposition that a university may make promises that last throughout a student's entire enrollment.  While this was true in the circumstances presented in *Kashmiri*, they are not true under the circumstances here.  In *Kashmiri*, the promise upon which the students relied expressly stated the fee in question would "'remain the same for each student for the duration of his or her enrollment in the . . . program.'" (*Kashmiri,* 156 Cal.App.4th at 833.)  Here, unlike in *Kashmiri*, none of the statements plaintiffs identify articulate a duration.  Under the facts as alleged in the operative complaint, plaintiffs could not have reasonably expected that the Regents' promise extended the entire duration of their enrollment.

*4. At a minimum, Boutros did not accept the terms of remote instruction for Spring 2020*

In light of our determination that plaintiffs sufficiently alleged the existence of an implied promise to provide an in-person, on-campus education for the Spring 2020 session, we next consider whether plaintiffs, as the trial court concluded, accepted remote learning by choosing not to withdraw from further education at their respective UC campuses.

Among the many documents of which the trial court took judicial notice were the statements from UC System officials announcing the decision to transition to remote learning in mid-March 2020. The documents reflect all campuses announced by March 19, 2020, that classes would be conducted by remote instruction for the duration of the Spring 2020 sessions. The allegations in the complaint as to plaintiffs Chen and Pham allege they paid tuition prior to attending classes in Spring 2020. Because the complaint also alleges classes commenced on March 30, it is unclear whether Chen and Pham had paid their tuition—and thus accepted the pre-COVID terms of education—prior to the date on which UC System schools gave notice that the Spring 2020 session would be remote. The allegations as to plaintiff Boutros, however, are more detailed; the complaint alleges she paid her tuition and fees on February 27, 2020. The complaint thus sufficiently alleges Boutros, at least, accepted the terms of the implied contract prior to the UC System's announcement that it was transitioning to remote learning, and has accordingly stated a claim for breach of contract as to the Spring 2020 session.

In reaching this determination, we respectfully disagree with the trial court's conclusion that the relevant date for

23

determining whether the students accepted remote learning for the Spring 2020 session was the deadline to withdraw from classes and receive a refund. As the court in *Kashmiri* explained, "the students paid their bills to take classes and receive an education, not to be entitled to a refund." (*Kashmiri, supra,* 156 Cal.App.4th at 847.) The students accepted the bargain offered by the Regents by the act of paying their tuition, not by the act of declining to withdraw.

### 5. *Regents Policy 3101 does not bar plaintiffs' claims as a matter of law*

Regents Policy 3101 provides that "The Regents expressly reserve the right and option, in its [sic] absolute discretion, to establish tuition or fees at any level it deems appropriate based on a full consideration of the circumstances . . . ."[8] The Regents contend this reservation of rights gives them discretion to decide whether unanticipated pandemic changes warranted refunds, and that in context, no statement on a website or catalog could reasonably be construed as the requisite "specific promise" necessary to establish an implied contract formed between the parties. We do not read the policy so expansively. The policy provides the Regents with discretion "to establish" tuition and fees at levels it deems appropriate. The Regents did so prior to billing plaintiffs for the Spring 2020 session, and plaintiffs

---

[8] "[P]olicies established by the Regents according to their constitutionally derived rulemaking and policymaking power . . . have the force and effect of statute." (*Akella v. Regents of University of California* (2021) 61 Cal.App.5th 801, 817.)

24

assented to those tuition and fees by paying their Spring 2020 bills.  The policy says nothing about granting the Regents the authority to retroactively change the terms of any implied contracts it offered students.  Indeed, under the interpretation urged by the Regents, they could offer any service they chose, no matter the promises they made before accepting payment for those services, and then simply declare whatever tuition and fees were charged and paid were appropriate in its discretion.  This is untenable.  While it is true that the Regents have broad discretion in many areas, they do not have unfettered discretion to avoid contract liability for its actions.

C.    *Plaintiffs Sufficiently Alleged a Breach of Implied Contract for Fees*

Plaintiffs also sufficiently alleged an implied promise for on-campus services.  The operative complaint alleges the UC System provides on-campus services to students, including campus libraries, student centers, gyms, counseling centers, health clinics, and sports complexes.  It also alleges the UC System made marketing statements highlighting those on-campus services, like UCLA's touting of "campus life," UCSD's focus on its "unique campus-wide events," UCSB's promotion of "undergraduate research in labs, libraries, and studios," and the statements centered on the availability and ubiquity of student organizations.  And plaintiffs allege that in addition to being charged for tuition, they were charged for various fees, including a student services fee for "services that benefit the student" and campus-based fees such as the campus activity fee to support "student activities on campus" charged by UCSD.  Again, reading the allegations in the light most favorable to plaintiffs, we

25

conclude this is sufficient to allege a specific promise for on-campus services.

The UC System President's June 2020 letter asking UC System schools to consider issuing partial refunds of the campus-based fees does not establish plaintiffs were required to exhaust administrative remedies before bringing this claim in court. "There are important limits to the exhaustion doctrine. Among them, we have declined to impose an exhaustion requirement when a purported administrative remedy did not incorporate 'clearly defined machinery for the submission, evaluation and resolution of complaints by aggrieved parties.' [Citations.]" (*Hill RHF Housing Partners, L.P. v. City of Los Angeles* (2021) 12 Cal.5th 458, 479.) Though the Regents assert the June 2020 letter triggered a "complex administrative process," and though the Regents asked the trial court to take judicial notice of a plethora of documents, the record is devoid of any further information regarding the purported administrative process. It does not reflect any "machinery for the submission, evaluation and resolution of complaints" by plaintiffs or other students. Accordingly, based on the limited information regarding the refund process, there is no reason to require exhaustion here.[9]

The Regents further argue the descriptions of the fees charged to students were "general plan[s]" rather than specific

---

[9] We are also skeptical of the assertion that plaintiffs were required to exhaust a process that did not exist when the initial complaint in this matter was filed. (See *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 840 ["Generally, statutes operate prospectively only"].)

26

promises made to the students.  In so arguing, the Regents contend plaintiffs needed to have alleged a specific promise for the provision of a particular service was made in connection with each individual fee.  The argument, however, is too granular for this stage of the litigation.  Plaintiffs have sufficiently alleged that the Regents specifically promised them an on-campus educational experience and that they paid fees for on-campus services.  Plaintiffs do not allege the fees were used improperly.  Rather, they allege they did not receive the benefit of their bargain with the Regents when paying the fees.  That suffices to survive the Regents' demurrer on that score.

DISPOSITION

The judgment dismissing plaintiffs' operative complaint is vacated. The cause is remanded for further proceedings consistent with the views expressed in this opinion, including our holding that at least one plaintiff has sufficiently stated an implied breach of contract claim for tuition and fees for the Spring 2020 session. Plaintiffs are awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

KIM, J.

LEE, J.[*]

_____

[*] Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to Article VI, section 6 of the California Constitution.